Terri Wood, OSB #88332
Law Office of Terri Wood, P.C.
730 Van Buren Street
Eugene, Oregon 97402
541-484-4171
Fax: 485-5923
Email: twood@callatg.com

Richard L. Fredericks, OSB #832034
750 Lawrence Street
Eugene, Oregon 97401
541-343-6118
Fax: 683-9240
Email: rlfred@comcast.net

Attorneys for Stanislas Meyerhoff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case Nos. CR-06-60078-01-AA |
| Plaintiff, | CR-06-60122-02-AA |
| -vs- | |
| STANISLAS GREGORY MEYERHOFF, | DEFENDANT'S RESPONSE IN OBJECTION TO GOVERNMENT'S SENTENCING MEMORANDUM |
| Defendant | |

    The problem with much of the Government's Sentencing Memorandum that supports its recommendations for Mr. Meyerhoff's sentence, pages 77–84, is that its portrayal of Mr. Meyerhoff as the most violent and dangerous of these

defendants, therefore deserving the greatest punishment, stands at odds with the facts as reported by its own law enforcement agents.

The Government's editorializing of the facts contained in its police reports to conjure up this image of Stanislas Meyerhoff as a "violent individual and a career anarchist," p. 77, begs the question: "Isn't the plain truth about Mr. Meyerhoff and what he did bad enough to support the Government's recommended 188 month prison sentence?"

Apparently not.

A fair reading of those reports establishes that, contrary to the Government's assertions, Mr. Meyerhoff did not agree to murder Jonathan Paul or anyone else;[1] that he did not possess firearms in connection with any of this group's criminal activities;[2] that he did not "research and develop newer and more effective destructive devices";[3] that he, along with others in this group, helped write only one manual—not "manuals"—about how to make incendiary devices;[4] and that Meyerhoff was no more of a leader of this group than Chelsea Gerlach, for whom the Government recommends no aggravating role.[5]

Take a look, for example, at two scenarios of the same event, the first based on the Government's portrayal of Mr. Meyerhoff in its memorandum, and the second based on what is in the law enforcement agents' reports:

---

[1] Government's Sentencing Memorandum (hereafter GSM), p. 77–79.
[2] GSM, p. 78–79.
[3] GSM, p. 77–78, 80.
[4] GSM p. 77.
[5] GSM p. 80–82, and compare recommendation for Gerlach, p. 95.
    The police reports also show that Meyerhoff once traveled from Oregon to Michigan to teach one person how to safely conduct an arson at a target picked by that person—not "spent many hours traveling across the United States to teach others how to use such devices to destroy university research facilities," GSM p. 77.

RESPONSE TO GOVERNMENT SENTENCING MEMORANDUM                               PAGE 2

Scenario #1 (Government's version): *Meyerhoff and Joseph Dibee, leaders in a secret cell of the nation's greatest domestic terrorism threat, are experienced in conducting acts of violence, sabotage, and planning assassinations. Targets are carefully researched, and reconnoitered. Once the target is selected, the mission will be accomplished; even if interrupted by law enforcement or otherwise disrupted, the mission will be completed another day.[6] Both Meyerhoff and Dibee possess arsenals of firearms.*

"While together, Dibee and Meyerhoff discussed Dibee's hatred for Jonathan Paul and discussed a plan to kill Paul. They dressed in black clothing, obtained a police scanner and a semi-automatic handgun and drove in Meyerhoff's vehicle from Seattle to Southern Oregon. The map they had was inadequate and they became lost in the rural area near Paul's residence. While stopped at a closed store to assess their situation, they were contacted by a local police officer and questioned about their presence in the parking lot. They told the officer that they were traveling from Seattle to San Francisco and had become lost. After the police contact, they decided to discontinue looking for Paul and return[ed] to Seattle." GSM, p. 79.

One wonders only how it is that Jonathan Paul survived unscathed throughout the intervening years until Meyerhoff's arrest and Dibee's flight from this country.

Scenario #2 (Agents' reports): *Joseph Dibee was an old guard ALF leader, "the Grandfather of a lot of stuff," who financed as well as participated in arsons*

---

[6] See, e.g., Vail Ski Resort; BLM Horse Corrals at Rock Springs, Wyoming; U.S. Forest Industries, Medford.

RESPONSE TO GOVERNMENT SENTENCING MEMORANDUM                      PAGE 3

*long before Meyerhoff joined this group. [Kolar 302: pp. 219, 235]*[7]*. At the very end of Meyerhoff's three-year stint with the group—shortly before he abandoned the ELF and became a college student—Dibee hired him to install a rebuilt engine in his truck. While staying at Dibee's home, Meyerhoff was a captive audience to Dibee's talk about his hatred of Jonathan Paul, due to what Dibee perceived as Paul having grievously mistreated a woman Dibee wanted to marry.*[8] *[Redacted].*

"He told Meyerhoff he wanted Paul dead and asked him to help. Meyerhoff refused and made it clear he would not participate in any murder." By the end of the week, "Dibee convinced him to drive to Paul's property in Southern Oregon for a reconnaissance. At the last minute, as Meyerhoff sat behind the wheel of [his car], Dibee told him to wait while he got a handgun for self defense against Paul. Dibee told Meyerhoff that Paul had guns. They argued about Dibee having the gun with him but Meyerhoff eventually gave in after Dibee reassured him there would be no murder. Meyerhoff trusted Dibee." [Redacted]. Another co-defendant said Dibee was "paranoid" and that he "always had a pistol under the seat of his car"; that Paul also had guns; and that both Dibee and Paul "asserted that guns were necessary for their safety." [Redacted].

So off they went, dressed in black, carting a scanner but no good maps, and got lost in the rural area trying to find Paul's property. After the encounter with the police officer, they "argued about whether they should abandon the

---

[7] The citations to the police reports, because they denote debriefing statements by various defendants, have been redacted from the electronically filed version of this document due to security concerns, but appear in the Court's and Government's copies.

[8] The defense reports a condensed version of Dibee's complaints about Paul, not intended in any way to credit Dibee's complaints as accurate, but rather to make clear his complaints were unrelated to any ELF/ALF goal or action.

reconnaissance. Dibee wanted to continue. Meyerhoff won the argument and they drove back to Seattle. Meyerhoff never saw Dibee after that trip." The woman at the root of all this said Dibee was very angry at Paul, but in her experience Dibee was "all talk" and no action. [Redacted].

Scenario #1, the Government's version of the facts, makes Meyerhoff look like a dangerous individual willing to commit murder, who should be locked up for that reason, not to mention the many arsons he participated in. Scenario #2, the Government's own facts according to the police reports, makes Meyerhoff look more like a young man who took a hot-headed friend for a long ride, and aborted at the first good opportunity. Is this even relevant to determining his sentence?

To make its tale of this "conspiracy to commit murder" seem relevant and sound more convincing, the Government foreshadows Meyerhoff's murderous intent, claiming: "In the Spring of 2001, Meyerhoff had conversations with William Rodgers about assassinations. Rodgers and Meyerhoff discussed the tactic of two riders on a motorcycle being able to weave in and out of traffic, shooting someone and then fleeing the scene and dumping the gun." GSM, p. 78. This version derives from an agent's report stating: "Meyerhoff recalled . . . Rodgers spoke about assassinations. Rodgers talked of being on the back of the motorcycle, being capable of weaving through traffic, shooting someone and then dumping the gun." [Redacted].

The difference is like taking the statement: "Rogers told Meyerhoff about his plan to kill the president," and twisting it into: "Rogers and Meyerhoff discussed plans to kill the president." The defense cries "foul!" *See, Berger v. United States*, 295 US 78, 88 (1935).

The Government should candidly acknowledge that all anyone knows about the interactions of "the Family" members and each individual's participation, is the imperfect, if not impeachable, recollections of the various co-defendants in this case, filtered through the eyes of the agents who summarized those statements in 302s.[9] The Government's version of the facts in its Sentencing Memorandum concerning Mr. Meyerhoff falls short by failing to identify the source of most of its information, and presenting its version as the truth of what occurred.

The Government immediately follows its claim that Meyerhoff and Rogers discussed assassination tactics with a brief mention of Meyerhoff and Gerlach having "earlier" purchased two semi-automatic rifles which they wrapped and buried near their residence. GSM, p. 78-79. There is, in truth, no temporal, geographical, or factual connection between Rogers telling Meyerhoff about his

---

[9] While hearsay statements may be considered at sentencing, due process requires that such statements be corroborated by extrinsic evidence sufficient to establish "some minimal indicia of reliability." *United States v. Petty*, 982 F.2d 1365, 1369 (9th Cir.), *amended*, 992 F.2d 887, 992 F.2d 1015 (1993). This is particularly true in the case of post-arrest statements by alleged accomplices, which the Ninth Circuit has held to be too unreliable to use at sentencing. See, e.g., *United States v. Huckins*, 53 F.3d 276, 279 (9th Cir. 1995)(district court violated defendant's right to due process of law by premising his sentence upon the post-arrest hearsay statements of an accomplice). As the Supreme Court noted in *Williamson v. United States*, 512 U.S. 594,(1994), "[t]he fact that a statement is self-inculpatory does make it more reliable; but the fact that a statement is collateral to a self-inculpatory statement says nothing at all about the collateral statement's reliability." Id.

Hearsay statements by co-conspirators may be reliable enough to support the Court's factual findings when several conspirators make identical statements, given independently and under circumstances which limit the possibility for collusion, and not with expectation of any benefit, that corroborate one another, and are consistent with extrinsic evidence such as telephone records. *See, United States v. Valensia*, 222 F.3d 1173 (9th Cir. 2000), *judgment vacated on other grounds, Valensia v. United States*, 532 U.S. 901 (2001). The hearsay statements used as the source of "facts" concerning Mr. Meyerhoff's involvement in this conspiracy do not come close to meeting those standards.

assassination idea while they were briefly together in Olympia, Washington, in 2001, and Meyerhoff and Gerlach legally buying these guns while living near Eugene, Oregon in 1998. [Redacted]. They buried those rifles shortly after acquiring them, and the rifles remained buried for years after this group disbanded, [Redacted].

The Government well knows that none of these defendants ever carried guns, nor did they ever carry other, less-lethal types of weapons, such as knives or clubs, with them at any of the "Family" arsons. But it is difficult to portray defendants who do not use guns, knives or explosives to at least try to kill people, as terrorists. So the Government resorts to linking firearm possession to unrelated talk of assassination as a future tactic, to draw an illusory connection.

No less troubling is the Government taking the inculpatory debriefing statements of Mr. Meyerhoff, offered in the good faith spirit of cooperation, and using those statements in every conceivable way to his detriment. Clearly, the Government is entitled to inform the Court of all relevant information from debriefings. But there is a difference between providing necessary information for the Court's consideration and affirmatively wielding it to advocate for a higher sentence; a difference historically based on cooperating defendants having joined the Government's team, so to speak, and thus entitled to less adversarial treatment. That difference has been forsaken in this case.

<u>Meyerhoff's Contributions To Building Incendiary Devices</u>

The Government routinely overstates Mr. Meyerhoff's contribution to the development of the incendiary devices used by this group, falsely crediting him with invention, when what he did was to build timers for the devices, based on design plans furnished by codefendants Dibee and Rogers, and store-bought

components. See, e.g., GSM p. 77-78.

We are not talking about sophisticated designs or rocket science here: Building these devices meant connecting wires, by following instructions on a circuit diagram, between a list of parts obtained from stores. Some wiring connections on this circuit involved soldering, while other connections were done with glue or bullet connectors, and secured with electrical tape.

Basically, wires connected a cheap kitchen timer to a relay device (pre-made by Radio Shack) that rerouted the electrical signal from the timer's alarm to trigger a power source (a 9-volt battery), that in turn sent power to an ignition system (a model rocket engine stocked by hobby shops). That is the "SCR digital timing device" that Meyerhoff assembled from the diagrams he received. The spark from the ignition system would light matches, which would then light a larger source of flame, like a flare, which would in turn ignite vapors rising from the fuel containers.

According to one co-defendant who built similar devices from written instructions, independent of Meyerhoff, it took about 20 minutes to build an electronically-timed ignition system. [Redacted].

The police reports reveal that instructions for making incendiary devices ignited with the aid of kitchen timers were widely available and in use for years before Mr. Meyerhoff got involved.[10] Others, primarily Dibee and Rogers, provided the basic designs and circuit diagrams that Meyerhoff then worked with to make small improvements, geared to making the timed ignition part of the incediary device work accurately. Jacob Ferguson also provided suggestions and

---

[10] See diagrams for the "Old Fashion Kitchen Timer" from two editions of the "Final Nail," and compare with the SCR device in Rogers' manual, which are attached to the Court's and Government's copies of this memorandum.

RESPONSE TO GOVERNMENT SENTENCING MEMORANDUM                PAGE 8

ideas used by Meyerhoff. [Redacted].

According to the police reports, Gerlach, Rogers, Thurston, Ferguson and others besides Meyerhoff taught people how to build these devices, and many of the defendants, including those mentioned above and McGowan and Block, built or helped build devices for the various actions. [Redacted].

Meyerhoff, Gerlach, Ferguson and others made contributions to the manual, "Setting Fires With Eletronic Timers," that had been already written in draft form, or otherwise compiled from earlier publications, by Rogers. [Redacted].

Meyerhoff's contributions all came from what he learned by building and testing the devices from the plans provided by others, and included:

- Clarifications of instructions first published by Thurston in the "Final Nail," for making the "Old Fashion Kitchen Timer";
- Suggestions on how to connect wires for best electrical contact and durability;
- Advice on how to strip and connect wires, and how to wrap the wires with electrical tape to insulate them;
- Advice on how to test connections and the overall functioning of the device;
- Results of testing many varieties of timers;
- Providing instructions on the basic techniques of soldering, including how to tell a good solder joint from a poor one, and many tips on how

to select tools and materials for the job.[11]

Meyerhoff's contributions were the likely outcome of any young man, with some basic mechanical skills, assembling, testing and evaluating the operation of many devices, and then reporting on what he learned from this experience. His contributions are indicative of some minimal training in the use of voltmeters and soldering irons, but not those of an individual then capable of invention or even of modifying the design of a circuit for any significantly different purpose.

<u>Meyerhoff's Overall Role</u>

In speaking with agents, Mr. Meyerhoff summarized his role in this ELF group as being the technical guy, who never picked targets and who did not have contacts in the movement outside this group; "he would do the leg work, shopping, building devices—'the grunt work'," motivated by his desire to try to fit in with some group of peers. [Redacted].

The defense contends that Mr. Meyerhoff's involvement in the overall conspiracy does not warrant an aggravating role adjustment for two reasons: First, because this group functioned without any hierarchy; its members were anarchists—according to the Government—not militia. The police reports establish that no participant was less essential to successfully carrying out an action than any other. Every participant had the same goal: the success of the arson. Each participant had the authority to say no, to chose not to participate, and to chose to what extent to participate, in any given action. See, e.g., [Redacted].

---

[11] All of these soldering techniques are described elsewhere in many public domain locations; most notably, on the packaging that comes with almost every soldering iron sold at Radio Shack. In fact, the diagram on the back of one of the irons sold at Radio Shack is identical to one in the ELF manual.

Second, Meyerhoff's conduct does not warrant an aggravating role because the Government recommends no aggravating role for Ms. Gerlach, whose conduct was equally necessary to the group carrying out its primary objectives, and who participated in virtually all of the same crimes Mr. Meyerhoff did.

Make no mistake here. The defense is not arguing for Gerlach to receive an aggravating role adjustment. Her overall conduct is simply the most analogous to Meyerhoff's, out of any defendant for whom the Government is not seeking an aggravating role adjustment.

The Government states "Gerlach's roles in the crimes of conviction ran the gamut and included research, reconnaissance, lookout, device-assembler, driver, and communiqué writer." GSM, p. 93. What the Government fails to recognize is that Gerlach's routine duties of researching targets—a vital part of the selection process—and authoring communiqués, were of paramount importance to the primary objectives of this group:

The arsons were not an end in themselves; i.e., not a "primary objective" of this group. The objectives were to select targets thought to be representative of the companies that were profiting through destruction of the environment, and through inflicting economic damage via arson, to send a message to other companies similarly engaged that they could be next. Arson was likewise a means of fulfilling the other primary objective of garnering media attention to spread the group's political views on environmental destruction.

As Judge Coffin observed at Ms. Gerlach's detention hearing: "The fact that the government alleges that she played the role of a lookout in some of [the arsons] where others set the fire, to me that doesn't diminish, if true, her

participation. A team can't have everybody playing the same role. A baseball team has a—not everybody can be a pitcher. We need catchers, we need second basemen, et. cetera. An arson team probably needs a lookout. It's necessary to their function." [CR No. 04–60116 (12/22/05 transcript, p. 17–18)].

The defense acknowledges that Mr. Meyerhoff's statements as reported by agents have him claiming a supervisory role in three arsons: Romania, Jefferson Poplar, and EPD. His plea agreement provides that use of these statements, made as part of his cooperation, is governed by U.S.S.G. §1B1.8, which precludes use of such statements in determining the advisory guideline range. See Plea Agreement, ¶17(c).

Meyerhoff has, however, acknowledged as part of his plea agreement that the Government can prove beyond a reasonable doubt that he "was in charge of the team that performed the arson at Jefferson Poplar," and that "he organized the people who were assisting in the arson and assigned the duties to the participants." (Attachment 1 to Plea Agreement Letter). That statement of facts, drafted by the Government, does not include an admission of a supervisory role in any other arson.

In respect to the Romania and Jefferson Poplar arsons, the police reports show that Rogers was the leader and assembled the participants; Meyerhoff did not select or research these targets; research being part of the selection process. [Redacted] Meyerhoff and Gerlach jointly selected the EPD arson. [Redacted].

CONCLUSION

This memorandum has addressed the primary points of contention with the Government's Sentencing Memorandum, without expressly objecting to the

Government's version of the details of Mr. Meyerhoff's participation in some of the crimes. In some instances, the Government's version of the details is not consistent with the PSR, but the Government did not make timely objection to any of the facts as stated by the PSR. In some instances, the Government's version in its Sentencing Memorandum varies from Attachment 1 to the Plea Agreement, reciting the facts the defense was required to acknowledge the Government could prove beyond a reasonable doubt.

That said, the defense has elected to not bog down in those details here, but reserves the right to object or present contrary argument and evidence at Mr. Meyerhoff's sentencing hearing.

This memorandum has one goal: that Mr. Meyerhoff be judged by who he is now, and what he actually did in the past, not on a portrayal of what he did that omits facts or states opinions not based on the facts.

Respectfully submitted this 21st day of May, 2007.

....................../S/......................
Terri Wood, OSB 88332
Attorney for Stanislas Meyerhoff

....................../S/......................
Richard Fredericks, OSB 83203
Attorney for Stanislas Meyerhoff